**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 6, 2025**

# In the Court of Appeals of Georgia

A25A0061. CITY OF ALBANY v. SOUTH GEORGIA RAILS TO
　　TRAILS, INC.

DILLARD, Presiding Judge.

The City of Albany appeals the trial court's denial of its motion to dismiss South Georgia Rails to Trails, Inc.'s[1] breach-of-contract action against it. The City argues the trial court erred in finding (1) OCGA § 36-30-13 (a) does not render the agreement between the parties void and unenforceable; (2) the agreement was not void and unenforceable because of a lack of assent as to its essential terms; (3) the prohibition delineated in OCGA § 36–30-3 (a) is inapplicable to the agreement; and

---

[1] South Georgia Rails to Trails, Inc. will be referred to as "SGRT" throughout the opinion.

(4) the agreement does not violate the Constitution of the State of Georgia's Gratuities Clause. For the following reasons, we affirm.[2]

Accepting all well-pleaded factual allegations in the complaint as true and resolving all doubts in favor of SGRT,[3] the record shows that on April 30, 2015, the City executed a contract with SGRT—the owner of a 13.62-mile inactive railroad corridor running between Albany and Sasser, Georgia, as well as the designated trail manager for the property under federal railbanking law.[4] Under the terms of the

---

[2] Oral argument was held on December 3, 2024, and is archived on the Court of Appeals of the State of Georgia's website. *See* Court of Appeals of the State of Georgia, Oral Argument, Case No. A25A0061. (Dec. 3, 2024), available at https://vimeo.com/1036763901.

[3] *See Premier Eye Care Assocs., P.C. v. Mag Mut. Ins. Co.*, 355 Ga. App. 620, 623 (844 SE2d 282)(2020) ("[I]n ruling on a motion to dismiss, the trial court must accept as true all well-[pleaded] material allegations in the complaint and must resolve any doubts in favor of the plaintiff." (punctuation omitted)). Here, the factual background underlying this appeal is largely undisputed, and the subject contract is an exhibit to the complaint. *See* OCGA § 9-11-10 (c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

[4] A "trail manager" in this context "must agree to assume all responsibility for: (1) managing the right-of-way, (2) any legal liability arising out of the transfer or the use of the right-of-way (unless the sponsor is immune from liability, in which case it need only indemnify the railroad against any potential legal liability), and (3) the payment of any and all taxes that may be levied or assessed against the right[-]of[-]way."

agreement, SGRT conveyed the property to the City for $150,000; and in return, the City promised to develop it for "public open space and recreational purposes, including the development of a multi-use trail and installation of City utility lines." More precisely, the City agreed to "complete the trail along its 13.62 mile corridor within five (5) years of the closing of the purchase of the property," and the "trail design, including the trail's riding surface material, will be specified in a trail plan to be jointly developed by and formally approved by the parties."

In the years that followed, the City did not act to approve a trail plan, and it never constructed any portion of the trail. In fact, minutes taken at a meeting of the City's mayor and board of commissioners revealed that they never considered a master plan for construction of the trail or any alternatives. But as permitted by the agreement, the City *did* construct utility lines along the property to increase its utility revenues and expand its service to more customers—many of whom are located outside of the City and Dougherty County. And according to SGRT, its contractual relationship with the City is inextricably "intertwined with the regulatory provisions of the federal railbanking law,[5] and the City's default under the [a]greement

[5] Federal railbanking law regulates right-of-ways previously owned by a railroad. *see Rails to Trails Conservatory,*

endangers the [p]roperty's interim trail use status and, possibly, the City's ownership interest in the [p]roperty."

As a result of the foregoing, on October 26, 2022, SGRT filed a complaint against the City for breach of contract. And in doing so, SGRT alleged that to comply with federal railbanking law and preserve the property's railbanked status, SGRT and the City must ensure the property is "kept intact, continuous, unencumbered by the accumulation of substantial future financial burdens, and unobstructed by significant structures that would impede or impair rail reactivation." Thus, the City's failure to "keep the [p]roperty intact and continuous for future rail service could result in a severance of the corridor, invalidation of the interim trail[-]use status, and a final abandonment of the corridor, with attendant circumstances."

In 2018, the City's mayor and board of commissioners adopted a state-required strategic plan, and under the "Economic Development and Jobs" section, it stated

---

*https://www.railstotrails.org/trail-building-toolbox/railbanking* (last visited May 5, 2025) ("Railbanking, established in 1983 as an amendment to Section 8(d) of the National Trails System Act, is a voluntary agreement between a railroad company and a trail sponsor (such as a trail organization or government agency) to use an out-of-service rail corridor as a trail until a railroad might need the corridor again for rail service. This interim trail use of railbanked corridors has preserved thousands of miles of rail corridors that would otherwise have been abandoned.").

objectives of "complet[ing] the installation of natural gas and telecom infrastructure along the rails-to-trails property" and "construct[ing] rails-to-trails with associated utility infrastructure." Then, in a 2019 budget report, the City listed those objectives as "ongoing." And while the City never constructed a trail along the property, it did construct a nine-foot wide "multipurpose trail," which extended from downtown Albany to a dead end where it intersected with the property—which then extended from there to Sasser.

Later, the mayor and board of commissioners authorized a Transportation Special Purpose Local Option Sales Tax ("TSPLOST") referendum, which the City's voters approved in 2019. The TSPLOST included $4,200,000 for multi-purpose trails and its promotional materials referenced the Albany-Sasser trail. Also in 2019, the City identified funding for and developed detailed construction plans for a significant portion of the Albany-Sasser trail. The City also solicited bids for paving "Phase I and II" of the trail and opened them in March 2019; but it did not accept the low bids for those phases before the time for doing so expired. The five-year deadline under the agreement for the City to construct the trail then expired on May 14, 2020.

Even so, the City continued to operate utility lines along the property to service customers.

In sum, SGRT alleged the City breached the 2015 agreement when it failed to build a trail along the property. SGRT also claimed the City's refusal to consider or formally approve a trail design or surface violated the duty of good faith and fair dealing under the agreement, which Georgia law requires of every party to a contract.[6] Indeed, in executing the agreement, SGRT entrusted its only physical asset to the City in exchange for its financing and construction of the trail. And the City's failure to fulfill the terms of the agreement jeopardized SGRT's ability to comply with federal railbanking law—particularly in its capacity as a trail manager. As a result, SGRT sought $7,000,000 in damages.[7]

---

[6] *See Piedmont Off. Realty Tr., Inc. v. XL Specialty Ins. Co.*, 297 Ga. 38, 42 (771 SE2d 864) (2015); *Pangborn, LLC v. Stonecipher*, 368 Ga. App. 800, 810 (890 SE2d 369) (2023); *280 Partners v. Bank of North Ga.*, 352 Ga. App. 605, 610 (1) (b) (ii) (835 SE2d 377) (2019).

[7] SGRT also brought a claim for specific performance, seeking to require the City to fully comply with its obligations under the agreement within such reasonable time determined by the court. That said, SGRT's request for specific performance is not at issue on appeal.

On November 28, 2022, the City answered the complaint and moved to dismiss it for failure to state a claim upon which relief may be granted. The City contended that the parties' agreement was invalid, void, and unenforceable as a matter of law. More precisely, the City claimed the agreement violated OCGA § 36-60-13 because it did not include a required termination provision or the City's total obligation for each year of executing the contract, which also means that it failed for lack of the parties' assent to its essential terms. Following oral argument and SGRT's response in opposition to the City's motion to dismiss, the trial court denied it. This appeal follows.

We review *de novo* the trial court's ruling on a motion to dismiss, "accepting as true all well-[pleaded] material allegations in the complaint and resolving any doubts in favor of the plaintiff."[8] But we are under no obligation to "adopt a party's legal conclusions based on these facts."[9] Importantly, a motion to dismiss for failure to state a claim upon which relief may be granted

---

[8] *Parnell v. Sherman & Hemstreet, Inc.*, 364 Ga. App. 205, 213-14 (3) (b) (874 SE2d 394) (2022) (punctuation omitted).

[9] *Id.* at 214 (3) (b) (punctuation omitted).

should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.[10]

With these guiding principles in mind, we turn now to the City's specific claims of error.

1. The City argues the parties' agreement is invalid, void, and unenforceable because it violates OCGA § 36-60-13 (a). We disagree.

OCGA § 36-60-13 (a) provides, *inter alia*, as follows:

Each county or municipality in this state shall be authorized to enter into multiyear lease, purchase, or lease-purchase contracts of all kinds for the acquisition of goods, materials, real and personal property, services, and supplies, provided that any such contract shall contain provisions for the following:

> (1) The contract *shall terminate absolutely* and without further obligation on the part of the county or municipality at the *close of the calendar or fiscal year* in which it was executed and at the close

---

[10] *Id.* (punctuation omitted).

of each succeeding calendar or fiscal year for which it may be renewed as provided in this Code section; [and] . . .

(3) The contract *shall state the total obligation of the county or municipality* for the calendar or fiscal year of execution and shall further state the total obligation which will be incurred in each calendar or fiscal year renewal term, if renewed. . . .[11]

SGRT does not contend the agreement satisfied these provisions, but instead argues the statute is inapplicable because, *inter alia*, the contract involves and arises from the City's proprietary—rather than governmental—functions. In this regard, OCGA § 36-60-13 (j) expressly provides that "[n]othing in this Code section shall restrict counties or municipalities from executing reasonable contracts arising out of their *proprietary functions*."[12] And we have held that "[a]ctivities that are undertaken

---

[11] (Emphasis supplied). OCGA § 36-60-13 (a) delineates numerous provisions that must be included in an agreement when a municipality enters a multi-year contract; but on appeal, the City argues only that the agreement in this case violates OCGA § 36-60-13 (a) (1) and (3).

[12] (Emphasis supplied). *Cf. City of Decatur v. DeKalb Cnty.*, 289 Ga. 612, 614 (713 SE2d 846) (2011) ("If the language of the contract is plain, unambiguous, and capable of only one reasonable interpretation, that interpretation must control, and no construction of the contract is required or even permissible."); *SPI Holdco, LLC v. Mookerji*, 361 Ga. App. 449, 453 (1) (864 SE2d 633) (2021) ("[W]hen the language of a contract is plain and unambiguous, judicial construction is not only unnecessary but

primarily for public benefit *rather than for revenue production* are governmental functions and the [municipality] is shielded from negligence claims by sovereign or governmental immunity."[13] But when a municipality undertakes activities that are primarily for producing revenue, it is then performing a proprietary function and is not entitled to such immunity.[14] And here, because the City's actions were *primarily*

forbidden" (punctuation omitted)); *Fid. & Deposit Co. of Md. v. Lafarge Bldg. Materials, Inc.*, 312 Ga. App. 821, 823 (720 SE2d 288) (2011) (same).

[13] *City of Atlanta v. Durham*, 324 Ga. App. 563, 565 ( 751 SE2d 172) (2013) (emphasis supplied); *see, e.g.*, *Gooden v. City of Atlanta*, 242 Ga. App. 786, 788 (531 SE2d 364) (2000) ("It has been held uniformly in this state that the operation of public recreational swimming facilities, primarily for public benefit *rather than for revenue producing*, is a governmental function, so that the city is shielded from negligence claims by the doctrine of governmental immunity." (emphasis supplied)); *City of Atlanta v. Mapel*, 121 Ga. App. 567, 569 (174 SE2d 599) (1970) (noting this Court has an established line of cases holding that maintaining parks and recreational facilities are governmental functions); *Pollock v. City of Albany*, 88 Ga. App. 737, 741 (2) (77 SE2d 579) (1953) (holding that maintenance of a park is a governmental function if the park is "primarily for the use of the public, intended as a place of resort for pleasure and promotion of health of the public at large," but the same would be a "ministerial" function if the park was primarily used as a source of revenue). Some of these cases use the terms "propriety" and "ministerial" interchangeably. *See, e.g.*, *Bd. of Comm'rs of Chatham Cnty. v. Chatham Advertisers*, 258 Ga. 498, 499 (2) (371 SE2d 850) (1988) ("The operation of a public transportation system, such as a scheduled fixed-route transit bus system—which includes the placement of bus benches—is a *proprietary or ministerial* function." (emphasis supplied)).

[14] *See City of Atlanta v. City of Coll. Park*, 311 Ga. App. 62, 68 n.15 (2) (715 SE2d 158) (2011) ("Under Georgia law, when [a city] acts in its capacity as a lessor at the

undertaken for the purpose of producing revenue, rather than for benefitting the public, the provisions of OCGA § 36-60-13 (a) do not immunize the City from SGRT's breach-of-contract claim.[15]

Lastly, we acknowledge that, in denying the City's motion to dismiss SGRT's complaint, the trial court did not rule on whether the actions taken by the City were governmental or proprietary.[16] Instead, relying heavily on our Supreme Court's

---

airport for the purpose of obtaining revenue, it is acting in a proprietary capacity and not carrying out a governmental function."); *Clayton Cnty Bd. of Tax Assessors v. City of Atlanta*, 286 Ga. App. 193, 203 (4) (648 SE2d 701) (2007) (holding that the City of Atlanta was not exempt from paying ad valorem taxes to Clayton County where Atlanta had only acted in "its proprietary capacity" with respect to a "profit-generating undertaking" in the County), *overruled on other grounds by Gilmer County Bd. of Tax Assessors v. Spence*, 309 Ga. App. 482 (711 SE2d 51) (2011); *Johnson v. State*, 107 Ga. App. 16, 18-19 (128 SE2d 651) (1962) (holding that "[a] municipal corporation acts in a proprietary rather than a governmental capacity in operating an electric distribution system" when the contract at issue provided that selling electricity to customers must generate a certain level of revenue); *Caroway v. City of Atlanta*, 85 Ga. App. 792, 796 (1) (70 SE2d 126) (1952) ("[When] . . . a city maintains an airport passenger terminal . . . for a substantial profit [it constitutes] a private ministerial and proprietary undertaking."); *see also Mapel*, 121 Ga. App. at 569 (noting that streets and *utilities* are "classical examples" of non-governmental functions).

[15] *See supra* notes 13 & 14.

[16] The City maintains the trial court "implicitly" ruled that the construction of the Albany-Sasser trail was a proprietary function. We disagree. While the trial court quoted OCGA § 36-60-13 (j) and *mentioned* that the statute does not apply to proprietary functions, it never addressed whether the actions the City undertook in

11

decision in *Greene County School District v. Circle Y Construction, Inc.*,[17] a case involving a statute nearly identical to OCGA § 36-60-13,[18] the trial court found the statute did not apply because the complaint alleged the contract was approved by the voters through an ELOST.[19]

---

*this* case were proprietary or governmental. To the contrary, in a footnote, the trial court simply noted that it need not make that determination because it denied the City's motion on other grounds, which are discussed *infra*.

[17] 291 Ga. 111 (728 SE2d 184) (2012). The City rightly acknowledges that *Greene* is binding precedent on this Court and the trial court, but nevertheless believes it was wrongly decided and should be overruled. *See Thompson v. State*, 358 Ga. App. 553, 557 (1) (855 SE2d 756) (2021) ("Although [the appellant] argues that this well settled authority should no longer be followed in Georgia, we are bound by the opinions of the Supreme Court."). Understandably, the City makes this contention to preserve the issue for future appeals.

[18] *See* OCGA § 20-2-506 (b) (providing that "[e]xcept as otherwise provided in this Code section, each county, independent, or area school system in this state shall be authorized to enter into multiyear lease, purchase, or lease purchase contracts of all kinds for the acquisition of goods, materials, real and personal property, services, and supplies, provided that any such contract shall contain [certain enumerated] provisions . . . ."); *Greene*, 291 Ga. at 111-13 (evaluating the applicability of OCGA § 20-2-506 (b) in the context of a contract entered into by a school district).

[19] *See Greene*, 291 Ga. at 111-13 (holding that OCGA § 20-2-506 did not apply because voters approved the contract at issue through an education local option sales tax or ELOST); *Wasilkoff v. Douglas Cnty.*, 227 Ga. App. 232, 233 (488 SE2d 722) (1997) ("[T]he Georgia Constitution's requirement of voter approval before incurring any "new debt" applies to a contractual obligation incurred by a political subdivision of the state beyond a single fiscal year. Multi-year lease purchase contracts, however,

12

Generally speaking, issues which have not been ruled on by the trial court "may not be raised on appeal."[20] Even so, this Court may affirm a trial court's grant of a motion to dismiss "if it is right for any reason, so long as the argument was fairly presented to the court below."[21] And here, SGRT certainly argued—both in its response to the City's motion to dismiss and during oral argument before the trial

are authorized without voter approval under OCGA § 36–60–13, in certain strictly limited circumstances." (punctuation and citations omitted)); *see also* Ga. Const. art. IX, § 5, ¶ I (a) ("[N]o such county, municipality, or other political subdivision shall incur any *new* debt without the assent of a majority of the qualified voters of such county, municipality, or political subdivision voting in an election held for that purpose as provided by law." (emphasis supplied)). Accepting all of SGRT''s factual allegations as true, although the City's voters approved the TSPLOST, they did not do so until March 2019. As noted *infra*, the trial court found that OCGA § 36-60-13 did not apply here because of this voter approval. But given that the City contractually agreed, in 2015, to build the trail within *five* years, it is unclear how the voters could approve of that new debt *four* years later such that OCGA § 36-60-13—which delineates the provisions that must be *included* in the contract to begin with—would not apply. In any event, as explained *infra*, we may affirm the trial court's decision if it is right for any reason raised below.

[20] *Ga. Dep't of Nat. Res. v. Coweta Cnty.*, 261 Ga. 484, 485 (405 SE2d 470) (1991); *see Pneumo Abex v. Long*, 357 Ga. App. 17, 29 (2) (849 SE2d 746) (2020) ("As we have repeatedly explained, this is a Court for the correction of errors of law, and if the trial court has not ruled on an issue, we will not address it. Indeed, without a ruling by the trial court on a particular issue, there is nothing for this Court to review upon appeal." (punctuation omitted))

[21] *Alred v. Ga. Pub. Def. Council*, 362 Ga. App. 465, 471 n.13 (869 SE2d 99) (2022).

court—that the City's use of the property to raise revenue through providing utility services was a proprietary action. So, while the trial court denied the City's motion to dismiss on another basis, we may nevertheless affirm its decision for this reason. And we do so here.

2. Next, the City maintains the parties' agreement was invalid, void, and unenforceable for a lack of assent to its essential terms. But the trial court did not address this argument, and we will not consider it for the first time on appeal.

In its motion to dismiss the complaint, the City argued, *inter alia*, that the agreement was void and unenforceable because the parties did not assent to its essential terms.[22] Indeed, the City complained the agreement did not specify how much it would need to spend building the trail or the amount at which its expenses would be capped. And prior to substantively addressing the City's contentions, the trial court characterized one of them as being that the agreement was void because it "failed to provide the City's 'total obligation for each year of execution' . . . in contravention of [OCGA §] 36-60-13 and duly signaling a lack of assent under OCGA

---

[22] *See* OCGA § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.").

14

§§ 13-3-1 and -2." Then, the trial court addressed whether OCGA § 36-60-13 applied to the agreement.

After concluding that it did not apply due to voter approval, the trial court summarily stated, "since [OCGA] § 36-60-13 is inapplicable here, noncompliance with [its] provisions do[es] not signal a lack of assent." But the trial court did *not* address whether the parties assented to the agreement's essential terms, instead appearing to conflate that argument with the applicability of OCGA § 36-60-13. Suffice it to say, we are a "court of review, not of first view,"[23] and if the trial court "has not ruled on an issue, we will not address it."[24] So, without a ruling by the trial court, there is "nothing for us to review upon appeal."[25] Thus, because the trial court did not address whether the parties assented to the agreement's essential provisions, we decline to do so as well.

---

[23] *State v. Jennings*, 362 Ga. App. 790, 796 (1) (c) (869 SE2d 183) (2022) (punctuation omitted).

[24] *Pneumo Abex*, 357 Ga. App. at 29 (2) (punctuation omitted).

[25] *Id.* (punctuation omitted).

15

3. Next, the City argues the parties' agreement is void and unenforceable because it violates the provisions of OCGA § 36-30-3 (a). But because the City also raises this argument for the first time on appeal, we decline to address it.

OCGA § 36-30-3 (a) provides that "[o]ne council may not, by an ordinance, bind itself or its successors so as to prevent free legislation in matters of municipal government." And in its motion to dismiss SGRT's complaint, the City argued the agreement (1) was void and unenforceable because it violated OCGA § 36-60-13—an argument we rejected in Division 1 *supra*—and (2) violated the Gratuities Clause of the Georgia Constitution.[26] Importantly, the City contended—as part of its OCGA § 36-60-13 argument—that the agreement was also void because the parties did not assent to its essential terms. But the City did *not* argue in its motion to dismiss *or* at oral argument before the trial court that the agreement was void for violating OCGA § 36-30-3 (a).

Indeed, in its order, the trial court referenced the statute only a single time when noting that it was at issue in another case. So, for the same reasons given in

---

[26] *See* Ga. Const. art. III, § 6, ¶ VI (a) ("Except as otherwise provided in the Constitution, (1) the General Assembly shall not have the power to grant any donation or gratuity or to forgive any debt or obligation owing to the public . . . .").

Division 2 *supra*, we decline to address this claim of error.[27] Even so, like OCGA § 36-60-13, OCGA § 36-30-3 (a) does not apply to proprietary functions of the government.[28] And we have already determined in Division 1 *supra*, that the City's actions here were proprietary in nature.

4. Finally, the City argues the parties' agreement is void and unenforceable because it violates the Gratuities Clause of the Georgia Constitution. This claim also lacks merit.

The Gratuities Clause of our Constitution provides that "[e]xcept as otherwise provided in the Constitution, (1) the General Assembly shall not have the power to grant any donation or gratuity or to forgive any debt or obligation owing to the public . . . ."[29] And in rejecting the City's gratuities-clause argument, the trial court

---

[27] *See supra* notes 22-24 & accompanying text.

[28] *See Unified Gov't of Athens-Clarke Co. v. Stiles Apartments, Inc.*, 295 Ga. 829, 833 (3) (764 SE2d 403) (2014) (explaining that there are four questions to consider when determining whether a municipal contract is subject to the prohibition to OCGA § 36-30-3 (a), one of which is whether the contract is governmental in nature and hence subject to the prohibition, or *proprietary and hence not subject to the prohibition*); *City of Powder Springs v. WMM Props., Inc.*, 253 Ga. 753, 756 (2) (325 SE2d 155) (1985) ("It is clear that the prohibition [set forth in OCGA § 36-30-3 (a)] is applicable to a municipality's governmental functions, not its proprietary functions.").

[29] Ga. Const. art. III, § 6, ¶ VI (a).

17

summarily stated that the City's citation to an opinion of the Attorney General was unpersuasive and non-binding.[30] In response, the City rightly notes that just because an opinion of the Georgia Attorney General is not binding does not automatically mean its argument is wrong. True enough. But as the City also *concedes*, the trial court "did not engage in any substantive analysis of the *merits* of the City's argument."[31] And Georgia appellate courts "will not rule on a constitutional question unless it *clearly* appears in the record that the trial court *distinctly* ruled on the point"[32] Here, it is undisputed the trial court did not substantively address the constitutional issue presented, much less distinctly. As a result, we will not address it.

---

[30] *See Synovus Bank v. Griner*, 321 Ga. App. 359, 369 (3) (739 SE2d 504) (2013) ("[O]pinions of the Attorney General do not constitute 'controlling authority.'").

[31] (Emphasis supplied).

[32] *Santana v. Ga. Power Co.*, 269 Ga. 127, 129 (6) (498 SE2d 521) (1998) (emphasis supplied); *see Regan v. State*, 361 Ga. App. 156, 158 (863 SE2d 527) (2021) ("Like the Supreme Court of Georgia, this Court will not rule on a constitutional question unless it clearly appears in the record that the trial court distinctly ruled on the point." (punctuation omitted)).

For all these reasons, we affirm the trial court's denial of the City's motion to denied SGRT's complaint.[33]

*Judgment affirmed. Mercier, C. J., and Land, J., concur.*

---

[33] We thank the Georgia Municipal Association, Inc. for submitting a thoughtful amicus brief.